Good morning. Judge Matheson, Judge Phillips and I are pleased to be here. Thank you to BYU for hosting us. We will proceed just as if we were in our normal settings. Counsel, are you ready to be heard? Very well, then. The first case this morning is the case of Smith v. Carpenter, case number 17-6184. Ms. Rolls, we're ready to hear you. Emma Rolls Good morning, Your Honors. May it please the Court. My name is Emma Rolls and I, along with Tom Hurd, represent the appellant, Mr. Smith, in this case. Your Honors, Mr. Smith is likely the most intellectually disabled capital habeas client whose case this Court has had the opportunity to consider. On what basis do you say that? Do you have some statistical review of the cases that you could help us with? I certainly can, Your Honor. In preparing for this argument, I read every capital habeas case of this Court involving an Atkins issue, either in the context of an IAC claim or in the context of a sufficiency challenge. And just a thumbnail sketch of those cases, in the Hooks case, there was IQ evidence presented, a scatter of scores from 53 to 80. Now, the Court and the experts isolated just two of those scores as valid, and those scores were 73 and 76, I believe. And the lower scores were cast out because of the client's lack of cooperation. So we have much higher scores in Mr. Smith's, but with respect to adaptive functioning in Mr. Hooks' case, the Court focused on the fact that he ran a sophisticated prostitution ring, he could read, he wrote letters that clearly expressed his emotions, and he consulted with a dictionary. With respect to Smith v. Duckworth, the case in which that I actually represented the petitioner, Mr. Smith had IQ scores of 76 and 79 pretrial, nowhere near the low 50s and 60s that we have here, and his entire argument depended solely on the Flynn effect and this Court's acceptance of the Flynn effect. With respect to Ochoa v. Workman, this case was more of a challenge to the Oklahoma law in general, and in fact, at the time of the trial, the defendant's own expert testified that he was not intellectually disabled. And I'd like to take a moment to say I will probably go from the terms intellectually disabled to mentally retarded, even though intellectually disabled is the clinically accepted term. But given that there's no red line that we can resort to and no particular statistical data point at which we could rest our case, or you could rest yours, where does that leave us, though? Do you really need to consider the other aspects of the tests the Supreme Court has laid out? Well, that's correct. Do you meet all three? We certainly can, Your Honor. I think it's probably best to you promptly address all three of those. Certainly, Your Honor. In Atkins, the Court mandated the acceptance of the clinical definitions. In footnote 22 of the Atkins opinion, wherein the Court referenced those state statutes that had already mandated the prohibition of the mentally retarded, it referenced the clinical definitions as the appropriate ways, and those statutes conformed with those. Counsel, in that regard, I've got a couple of questions that go to the point you just made. The first one is, you're not challenging the Oklahoma standard articulated in Murphy. I'm not, Your Honor. So we're working with the Murphy facts. We're working with the Murphy definition, which more or less mirrored the clinical definitions at the time. All right. So as to the first Murphy factor, intellectual function, the OCCA didn't ignore the experts. They talked about the experts. They talked about the experts' testimony, the tests they performed, the opinions they expressed. I'm having a hard time understanding the argument that I think you're trying to make, that the OCCA didn't consider clinical standards when there's references to all of those things in the OCCA's opinion. Well, what the OCCA did was recognize and perhaps repeat what the clinical evidence was, but they gave much greater credence to the lay witnesses as opposed to... Well, that's a matter of emphasis as opposed to ignoring clinical evidence. Are you saying they ignored the clinical evidence completely? Because that isn't really what they said in their opinion. I'm not saying they ignored it based on the intellectually disabled. Well, is non-expert evidence irrelevant to the first factor? It's not irrelevant, Your Honor, but clinical standards should always trump. And here, the clinical... Well, but counsel, we've got a problem because if clinical standards are important to the first factor, but non-expert or non-clinical standards are not irrelevant, and then we're starting to talk with, well, maybe the OCCA under-emphasized one or over-emphasized another, then we're going to run into the AEDPA situation where we have to defer to the OCCA. So how are we supposed to do that? Well, I'm certainly aware that AEDPA creates a hurdle here, but it does not preclude this court from looking at this sufficiency challenge and... Of course it doesn't because AEDPA doesn't... We have AEDPA as a deferential standard, not as an absolute block, but it's a deferential standard. What I'm asking you is for some help for us in how we're supposed to navigate the fact that the OCCA at least considered some of both types of evidence, albeit from your perspective, perhaps too much on one side than the other. Well, I think it's clear that the OCCA put great priority on this lay testimony. When they had... What do you make of the fact that in the Bobby James Moore case that just came down, the court decided on Judge Matheson is asking could well have mirrored what had to have happened there because the Texas Court of Criminal Appeals had done precisely what the OCCA has done here. They said no, ignoring apparently the test to some degree, they proceeded to go ahead and find Bobby James Moore to be competent, that is to say not intellectually disabled. And the Supreme Court in reversing that case didn't even so much as bother to mention AEDPA. They went straight to the elements and said no, this is not acceptable, reverse. Well, I think that's because AEDPA is here to correct these extreme malfunctions that we're seeing in this case. This is the case that meets the standards. Mr. Smith's IQ evidence... That's why I asked you. You have three criteria that you have to meet, right? Correct. And you concentrated on one, that is the IQ. So let's say we spot you an IQ of 55. Two 55s, your honor. Well, fine. If you're spotting your 55, we can spot you 10 55s, still 55. So quickly, the other two criteria because you have limited time. Yes, with respect to the adaptive functioning criteria, Dr. Hopewell administered the Vineland test and he found significant limitations to all of the areas of adaptive functioning. I need to remind this court that this is a man who was placed in classes for the educable mentally handicapped from the time he was seven years old. In order to be placed... And in Moore, what was the fact situation there? Moore was really focused more on these Bresenio factors and the adaptive functioning. So I'll focus more on the adaptive functioning. And with respect to the adaptive functioning, there was findings by Dr. Hopewell that in the communication sphere that Mr. Smith suffered from impoverished communication with an inability to be spontaneous and produce ideas and that he in fact functioned at the level of a five-year-old. With respect to functional academics... And when was this first identified? At what age? Well, I would... At what age was that? How old was he when that statement was made? Well, that statement was made on testing based in the 30s, but his... When Mr. Smith was in his 30s. But his placement in EMH classes as a young child would certainly show that the manifestations were there as early as very young, seven, eight years old. And he spent the entirety of his education in these classes, which required consistent testing for placement. Every three years this man was tested and qualified for these classes that was required an IQ from 50 to 75. But going back to the... As you go through these three prongs, it would help me if you were able to identify what specific Supreme Court case you're talking about and what the holding was that compels your conclusion that the evidence that you're going to cite runs afoul of the Supreme Court holding. The only clear... I'm not asking would we all do it the same if we were the jury, of course, because that's not the question. Certainly. We need that north star of the Supreme Court holding. The north star is Atkins itself, Your Honor. And I understand... But I want more specific than that. Well, when we look at Hall, when you look at Broomfield, when you look at Moore, what you see is time and time again are those courts are focusing in on the clinical underpinnings. And I understand... But can we look at those cases because they were decided after the OCCA addressed this case. And we have the Shoup case from this year, which says you've got to take into account Supreme Court law at the time that the state court made the decision. How are you going to get around Shoup by citing all these other cases that came after? Well, I don't have to get around Shoup, Your Honor, because in Shoup, the Supreme Court remanded the case for further consideration whether Mr. Hill could meet the criteria under clearly established law. Well, but isn't it basic EDPA law that we look at what the state court did based on clearly established Supreme Court law at the time it made its decision? You're citing cases that came after that. Let's ignore those cases that I cited after that. Let's rely exclusively on... Well, that's my question though. Do we ignore the cases that came after that? Well, I think to ignore what the court has said and the illustrations it has provided would be imprudent. But I recognize... Can you give me an example of where we've done that? I can give you an example in the area of Strickland cases. This court applied the Williams case, which was an interpretations of Strickland, to state court adjudications that occurred before the Williams case. And I apologize, I don't have the stipe right in front of me. Well, I would like to move you if we're going to pursue that before we get to the other elements. The law at the time was that you had to know about this intellectual disability at the time. And that was not Supreme Court law. Supreme Court law, all you were required to prove is that it manifested itself. Meanwhile, Oklahoma adopts a knowing standard. And they just pulled it out of the air and they said, oh, this is a temporary standard, which they later have rejected and no longer follow that. That's correct, Your Honor. So if we are to pursue the Matheson approach here, what law are we applying? The manifesting itself standard or the knowing standard? Well, Your Honor, I'm assuming this is about Proposition 2 with jury instruction, where this jury was, in fact, instructed not that it just needed to be manifested, but it had to have been recognized and appeared. That completely undercuts what manifest means. Manifest just means it was noticeable. And this added an entire clinical argument. Well, it became evident at. Became evident at. That is correct. And the lower courts have always analyzed this proposition with respect to a fundamental due process kind of approach. But this clearly is contrary to Atkins. Why? Why is it? Manifesting can mean a lot of different things. What if the jury instruction, he used that word and then went on to say, by manifesting, we mean recognizing and appearing or something? That wouldn't be a foul of Atkins because Atkins doesn't say what manifest means, does it? Perhaps. Perhaps the answer is yes, but that isn't the situation here. But what was even more problematic about the instruction and the attempt to ameliorate what was clearly an erroneous instruction was that the instruction read that this type of evidence or this appeared and known evidence could be established by lay opinion or poor school records. At no fault of Mr. Smith's, all of his school records were destroyed other than his high school transcript. And so immediately the prosecutor exploits this part of the argument to say, unfortunately for Mr. Smith, there's no records to show that he was mentally retarded at the time. But his two EMH teachers that testified clearly indicated he was properly placed. And exactly. The jury had that information. The jury knew from those witnesses who had experience with him that he was beset with these deficiencies. And so why? It's important because that language departs from the clinical definition. And if the Atkins is a nullity. And that's as simple as that. And that also goes back to the first proposition that there was ample evidence to support a verdict of mentally retarded in this case. Can I just ask you on this jury instruction, this was a jury instruction that came at the end of Murphy, right? Correct. It was appended to Murphy. And earlier you said you're not challenging Murphy, but you really are. You're challenging what was appended to Murphy. Is that fair? I'm not challenging the Murphy rule itself because the Murphy rule doesn't have that language in it. The instruction does though. And it's part, it's combined with the opinion. So are you challenging Murphy at least to that extent? Insofar as the instruction and how it was applied in this case, yes. I don't think it hurts you to say that. No, insofar, yes. But I'm just wanting to clarify. I clarify, yes. That insofar as it affects the instructions, yes. But the actual definition from Murphy only used the manifest language, which I think highlights the unreasonableness of the court's adoption of this precise instruction. They were just following what the Oklahoma Supreme Court said they're supposed to do when it was provided the instruction. I'm not saying you can't argue it's unreasonable, but that's what they did. Certainly, that is what they did. And they also two months later rectified the instruction to correct the problem, yet Mr. Smith did not get the benefit of that correction. Now, much of the state's case here rests on the allegation of malingering against my client. Dr. Call was the state's expert in this case, and he asserted that Mr. Smith was malingering. This is the chap who himself used the Blackwell memory test every single time, and he kept executing one person after another on the basis of testimony that they were all malingerers. That's correct, Your Honor. In fact, the court was wondering who the malingerer was. Well, I think it is interesting that Dr. Call was acknowledged by the Oklahoma Court of Criminal Despite the fact he has absolutely no clinical experience whatsoever with the intellectually disabled. He is a forensic psychologist. He has a JD. He does not have a clinical practice, unlike Dr. Hopewell, who testified on the behalf of Mr. Smith, who is a clinical practitioner and had years of experience diagnosing the intellectually disabled in the capacity as a with screening benefit recipients. He was particularly astute at detecting malingering. And his interpretation of the Tom tests, which were not normed on the intellectually or brain damaged population, both disabilities from which my client suffers, that the results on that Tom test did not indicate malingering. But what I'd like to say is any allegation of malingering is undercut by my client's placement in these classes when he was a seven-year-old. He would have had to have begun malingering when he was seven years old to be placed in these classes. And as his teachers testified, this man was properly placed. In fact, they noted that he was one of the lower to mid-functioning students in these EMH classes. Did you have any expert testimony that supports what you just said? I have expert... What specific part of what I just said? That being placed in classes shows he's not malingering? Because... Well, I think... Let me just finish the question. The malingering tests were conducted after, of course, after charges were brought in this case. That's years and years in separation from when he was put in classes. I don't understand how you can say he's put in classes so he couldn't have been malingering 20 years later or 30 years later. How can you make that claim unless you have some expert who can say that? Did any expert actually say that? No expert said that, but I think it's... Well, you just said it and you need to support... I'm supporting it, I believe, with logic, Your Honor, in that there is no opportunity. There's no motive. You're not a clinical psychologist either. No, I'm not, Your Honor. We need some expert help to understand if that claim is valid. Have you got any expert support for that? Well, we have Dr. Hopewell's testimony, not going back to whether he malingered when he was seven to be placed in EMH classes. Okay, I'm still there. I'm just concerned about that claim you just made. Okay. You don't have any expert support for that, correct? There's no expert testimony saying that it was impossible to malinger when he was seven. Isn't there a law in Oklahoma that provides that in order to be put in a subeducational level class that you have to meet certain criteria? Yes, and the special education director for Oklahoma City Public Schools, in fact, did testify. Well, that was my next question. Wasn't there testimony to that effect? Yes, there was testimony. So isn't the answer to Judge Matheson's question, yes, there is expert testimony? There's expert testimony about placement. She did not speak to malingering. What does it have to do with malingering? I mean, I understand the argument relative to the second element. I can see where it's relevant to that, but to bring it into this malingering debate, I don't see how you can do that. Well, I think the malingering point is that there's a motive to malinger after he committed a quintuple homicide. Right. There was no motive to malinger when he was seven to be placed in classes. But how does that cut? I mean, if there's a motive to malinger after he's charged, then wouldn't that suggest that it's more likely to malinger at that point? Well, it cuts in that he had low enough scores at age seven on testing every three years to maintain placement without any motive to malinger. Do we have a score from when he was age seven? No, because all school records have been destroyed. Okay, we don't have low enough scores then. There's nothing in the record of scores when he was seven, correct? No, but we have facts on the record that can clearly support the inference, and that is the- You said we have scores. We don't have scores, correct? We don't have scores before the murder occurred, but we do have scores before Atkins. And in 1997, Dr. Fred Smith, who was the DOC psychologist, who I would add has no dog in this fight. He is not an expert for either side. He's a DOC psychologist who deals with the intellectually disabled and mentally ill inmates on a daily basis. And what was his score? His score was 65 on an outdated waist. Let's say that he had, I don't know what his IQ was when he was in secondary school, but let's say that it's 73, and then he shows up with 255s. You can argue about whether there was malingering, can't you? I guess what I really want to ask you, and getting right down to it, is you make a fairly persuasive case on the malingering you have. You're able to marshal some facts, and if you're approaching us like a jury, then maybe we would agree with you. But that's not the test, right? Isn't the test whether any rational fact finder could have found malingering? That is the test, but may I add one thing, Your Honor, and I apologize. In Hooks, this court, an inescapable part of the inquiry is to look at the types of evidence that was relied upon here. And when you rely on the clinical evidence, it does not support malingering. Those tests on which Dr. Call, the go-to malingerer guy for the state of Oklahoma, those tests on which he relied were not normed for the intellectually disabled or the brain damaged, and my client is both. Not only does he suffer from low IQ, but he had a near-drowning event when he was 12 years old that resulted in a severe hypoxic injury. If I may, let's go back to square one. There is more than one criteria that has to be met. Certainly, Your Honor. And one of them you addressed, that is his developmental gradation at the very earliest years is very low. Yes. What are the other criteria? Well, the adaptive functioning. We need to go back to it. I believe we've established the IQ with all of the tests that were in the record all squarely placed. Well, I said let's pass by on that. Okay. So with the adaptive... Any other tests? The adaptive functioning testing of the Vineland showed that he had severe deficits in every area. The Murphy definition required deficits in only two. Mr. Smith operates at the level of a 5- to 7-year-old in all areas. On the wide-range achievement test... Now, just a second. Was there any evidence that he malingered about that? Well, there was some evidence that he... The strongest evidence that the OCA seemed to highlight in coming to the conclusion that he even failed on the first prong was that he was a head janitor. And there is... I think there was some stereotype about the fact that he had employment and that this was some proof then that he was not intellectual. Yes, that he was... The court expressly addressed that issue in this February opinion, and it said that is absolutely unacceptable. Absolutely unacceptable. And also the cases that I cited in my briefing, the Van Tran case out of the Sixth Circuit and Pruitt-Venial out of the Seventh Circuit. In both of those cases, the circuit court found the state court's determinations that a defendant was not In Van Tran, the lower courts relied on the defendant's post-crime conduct. He stole the victim's car, he took it to a gas station, he set it on fire... He drove it a great distance and he set it on fire. The state courts looked at that evidence and said, that just shows such keen planning. He couldn't be intellectually disabled. Well, that's preposterous. And that's precisely the type of evidence that the OCA relied on here in determining that Mr. Smith's ability to clean up the house and place the bodies of his victims in a made bed, under a bed and in a closet showed his ability to think clearly. What's more, his ability to carry on the duties of a janitor and these illusory type of supervisory duties ascribed to him are clearly within the abilities of the intellectually disabled. All of these are inaccurate stereotypes, and as long as courts are willing to overlook the clinical definitions and instead rely on inaccurate, improper stereotypes about the intellectually disabled, then Atkins will be a nullity. But the jury heard about his ability, had testimony in front of it about an intellectually disabled person might be able to be a supervisory janitor from various witnesses. And once again, we're not the jury. So what you need to persuade me of, and where I'm struggling with this, is that no rational fact finder, based on this array of evidence, not just that he's the head janitor, no rational fact finder could have found that he failed on the adaptive functioning, two of those. That's a tall order. It is a tall order, but if you're looking at the clinical evidence in conjunction with the lay evidence that equally supports these results, and you look at the unreasonable determinations of the OCA, because that cannot be ignored here, the OCA is the court that this court is really reviewing. It's not just the jury, it is the OCA. And they relied on these stereotypes time and again. Your honors, I see I only have about four and a half minutes. Well, go ahead, but we'll stop the clock there and Kyle, you may continue. That's all right. I was interested in your responding to the impeachment that the state did of the administration of the Vineland test. Certainly. Yes, and I think this also addresses some of Judge Phillips' concerns. If this court has any concern about some of the problems with the adaptive behavior testing that went on here, I think that this court should pay close attention to the arguments in proposition three, where we argued that the Atkins trial counsel were ineffective. The Atkins trial counsel had a really important benefit here that most trial attorneys don't. They got a sneak- Well, counsel, I'm not sure you're addressing my question. Okay. The criticism of the Vineland test is that it was given directly to Mr. Smith. Correct, correct. And that the Abbott's should have been administered instead. That was Dr. Call's testimony. All right. And are you getting to that? I'm getting right to that, your honor, I promise. Had trial counsel followed up with what they knew to be a certain challenge to the type of testing that Dr. Hopewell administered, and they knew it, because in the mistrial, by that point, the time that the mistrial occurred, the state had given opening statements wherein it attacked the Vineland. Excuse me, I got confused. In September 2003, counsel received the report of Dr. Call. And in Dr. Call's report, he clearly had problems with the way in which Dr. Hopewell used the Vineland, and he said that the Abbott's would have been the better test. So in September of 2003, trial counsel knew this was coming and did nothing. And I would argue that the performance here should be strictly scrutinized based on a case like Rompia. In Rompia, the Supreme Court found that the trial attorney was deficient in his performance when he knew precisely the type of evidence that the state was going to use. You're answering my question with an IAC argument. I am. All right? I am. What I want to know is, was this a valid criticism of the Vineland test? I mean, let's assume we don't go your way on the ineffective assistance. Certainly. And you're stuck with the record. Okay. Okay. Make the best case you can. Well, I think the reason the Vineland test, he went against the manual and that the Vineland was supposed to be administered to caretakers. But the problem is, is Mr. Smith has been incarcerated since 1992. And there is great trouble with assessing the adaptive behavior of a person who has no opportunity to really make decisions. They don't cook. They don't face the day-to-day adaptive choices that people out in a free society. And because of that, Dr. Hopewell, and again, I would remind the court, he was the person who was astute at detecting malingering and had this qualified experience with treating the intellectually disabled. He opted to use the Vineland in a certain way. I would also state that despite Dr. Call's scathing criticism of the use of the Vineland, he administered absolutely no adaptive behavior assessment. So he himself has nothing to rebut it. That answer your question adequately, Your Honor? I'm thinking about it. All right. I think we can now reserve the rest of your time. Counsel, we're ready to hear from you. Ms. Dixon? May I please the court? Jennifer Dixon here on behalf of the warden. Ms. Dixon, I'd like to ask a couple of the fundamental questions to this case and to all of these cases that involve intellectual disability. Our society has chosen, through Supreme Court precedent, the proposition that as a civilized society that we will not execute the mentally disabled. And so the fundamental question about the gentleman that is here before us today is whether he is, in fact, intellectually disabled as defined by the Supreme Court. Correct. I cannot help but be affected in my questions this morning by having re-read last night the Bobby James Moore v. Texas case, which is so close to this case in so many ways. Texas Court of Criminal Appeals, after a jury determination that there was a no mental retardation, as they used the term in earlier times, proceeded to remand the case for the determination where the Court of Criminal Appeals just gave them the same answer all over again. Finally, I think it's pretty evident that the court gets to the point where they just gave up and said, we aren't sending this back, we're reversing. Yes, Your Honor. Now, here you have a defendant who has an IQ, arguably, IQ of 55. OK. You have an expert who says, oh, he's lying. But he couldn't have been lying about the fact that he met the other elements of the case. His kid was in the lowest levels of his academic classes from the earliest age. Counsel tells us age seven. He is subjected to a test about not whether these disabilities manifested themselves. I don't see how anybody rational fact finder could argue with the proposition that they  I agree, Your Honor. But now he has to face a test that he somehow knew about it. I don't know how you go about meeting that test. He has to proceed to try to prove his case without school records. But we do have the benefit of the teachings of the teachers who testified. Now, I don't want to monopolize the time here this morning, but I must tell you that I'm chamber, a kid who was obviously impacted from the earliest age and depending on whether you buy into this malingering nonsense. I call it nonsense because this witness has been disowned by the very courts that relied on him in the past as they refused to rely on him anymore because everybody that came along before him was malingering. I'd like to have the benefit of your thinking as to why you feel that it does not violate the spirit of Adkins and the jurisprudence of the court of the United States Supreme Court to execute this young man. I admit that his acts were horrific. And I wasn't even going to go to his acts. I think, yes, five homicides and I wasn't going to go to his acts. You have to look at the posture of this case. And when you look at Moravie, Texas, that's a direct appeal case. So you don't have any AEDPA difference. And we're looking at this case through the lenses of AEDPA. So we have to look at the law that was in effect at the time. There's no argument that Murphy, the law in Murphy, was contrary to or contrary to Adkins. And so everything was in place. I mean, this defendant got a mental retardation trial. He actually got an Adkins trial. With regards to Dr. Call, the Blackwell memory test, it wasn't even an issue in this case. It wasn't. There was no testimony on it. It wasn't brought out. He didn't use that test to test for malingering. So there's nothing involving that with Dr. Call. And not with regards to Proposition 1, but just with regards in general. Petitioner's own expert, Dr. Hall, Teresa Hall, testified that he malingered. And that was later on in his re-sentencing and his competency proceedings. He malingered with Dr. Rausch. And I think he scored like a 6 or a 7. It was below the 1%. And even in this mental retardation trial, Dr. Fred Smith, when he testified, he testified that what he was examining Petitioner for is a multi-personality disorder. And he was concerned that somebody was coaching him, trying to give him reason that he would have multiple personality disorder. So the idea that malingering is somehow only relevant in this case at the MR trial because of Dr. Call really isn't accurate. I mean, even Dr. Hopewell's test, when you don't modify the norms, showed he was malingering. So you have IQ... Could you explain that? Sure. Dr. Hopewell testified that he also gave Tom and he gave a 15, the Ray 15 item test. It's a 15 item test. It's another malingering test. And rather than... And what he did was modify the norms. So that even though the Tom, he did come up as if he was malingering, Dr. Hopewell's testimony was, but because I determined he's mentally retarded, then I'm going to modify the norm. And what Dr. Call brought out on, or what evidence Dr. Call brought out when he testified is... And I don't think, and I know Dr. Hopewell didn't testify that there was any journals or research that would support his position to do that. But Dr. Call brought that out. There's absolutely nothing in the medical community that shows you should be modifying the norm. So you have malingering with both experts as far as the test go. And I know IQ... I mean, I don't think there's any doubt that he was in special education classes. That's... I don't think I could argue that he wouldn't have met prong two of Murphy. And the court of criminal appeals didn't even touch on prong two. The only prongs that they really talked about were prong one and prong three. Are you conceding prong two? I'm conceding that there would be evidence of, yes, mental retardation prior to the age of 18. I mean, it seems to me like that's just really a cutoff as, you know, when you want to term something as brain damage versus mental retardation. So as long... To me, that the age of 18 doesn't seem to be anything other than will disqualify under Atkins for mental retardation. So yes, I mean, I don't think I could stand up here and say there wouldn't be sufficient evidence that he had some sort of intellectual disability or some sort of sub-average intelligence at that age because he was placed in these classes. Well, you don't seem to press the point in your brief. That's... No, I mean, yeah, it's... I mean, the evidence is there. I know at the hearing, you know, there was a lot to be made about, well, do you have to be mentally retarded to be in this class? And there were no... There's other types of individuals that are in those classes. And unfortunately, we didn't have the records, but we did have testimony from the teachers that he functioned and he functioned low. But I think what the court had to focus on and what the jury had at the mental retardation proceedings was they did have IQ exams. They had, you know, some that were pre-Adkins and some that were post-Adkins. But as the opposing counsel, you know, recognized all of these IQ exams were all after there was... he's been charged in this case. And, you know, initially, when you look back in 1993, his counsel had him evaluated based on competency. So they wanted competency proceedings. They had him looked at by Dr. Edith King and also by... The names are escaping me. But so, I mean, his mental... The IQ... I'm trying to say this politely, but the reason to malinger has always been there since the beginning of these... of this case based on the arguments counsel was making. I mean, if you look at the 1993 videos of his... So he doesn't have an IQ of, like, 55. He's basically rigging the test and lying to get there. What do you contend his IQ was? There's actually... I mean, the closest that we come that you could rely on because there... I don't think there were malingering... How do you know he wasn't malingering about that? But what is the number? I would argue that the two that you would probably rely on the most would be the 70 and the 73. And I say 70 because I know Dr. Smith testified initially he gave him a 65... He tested out a 65, but he also testified that he thought he was a little bit brighter than that so he gave him this RAVEN test so you could get a range and the range he fell in was, I want to say, 69 to 78. When he testified at this hearing, he said he's no longer as skeptical as he used to be. It doesn't mean he's not skeptical. And if you look at his testimony, I think he says he falls on the cusp and if he had to give a... If he had to vote, he would err on the side of mental retardation. Just explaining, what is the cusp? I really don't. I mean, I guess he means because he's going to be right at 70 between 69 and 78. Again, that is if we're limiting. Did any of the IQ tests show that he was not intellectually disabled? I guess the only thing I could argue with that would be the 73, if you take the standard error of measurement could probably push him up to a 78, but I mean... I thought you said that his opinion was, notwithstanding whatever the score may be, that he was, quote, he said if he had to take a side, that's what he would vote on. But again, you're looking at... Oh, excuse me, sorry. Speaking of taking sides, did any expert at the trial, the intellectual disability trial, conclude that Mr. Smith was not intellectually disabled? I don't think so. Dr. Call's testimony was, I can't give you an answer either way because this testing is all inadequate. He said I can't tell you that he is and I can't tell you that he isn't. Why doesn't that resolve the first element? Because... Even under Jackson Review, if you don't have any expert at the trial who can say that Mr. Smith was intellectually disabled, how can that possibly establish that the first element, the first Murphy element is established? Well, I think you have to look at... With Dr. Call's testimony, he's there to, I guess, I don't want to say rebut, but basically refute some of Dr. Hopewell's findings. But it definitely doesn't meet problem because the IQ alone isn't the factor. That's right. His question is whether he's, it's not whether it's 55 or 65 or 70, it's whether he's intellectually disabled. And the doctor said, if I have to vote, I don't know, that's an interesting way to do a diagnosis, but I guess if you have to vote, he's going to vote for mentally disabled. Yes. And I've been curious about Judge Mathis's questions. I'd like you to answer that. Do you have any testimony, unequivocal testimony that he wasn't? With Dr. Fred Smith saying I would vote, you have to take into consideration too, he didn't do any adaptive... No, no, but let's get an answer to Judge Mathis's question. Yes. Does that mean prong one is net? And no, I would agree, I would say it doesn't because there's a little bit more to prong one. And that is, does the sub-average intellectual functioning, does it actually substantially limit his ability to, and it's all the factors, understand and process information, communicate, you know, the list of them. Do you have a single case with IQs like are described in this record where prong one is met? I've seen a lot of cases with higher IQs where prong one is not met. I'm trying to think. I'm not sure what case it was where we divided them into two, you know, areas, there were like eight IQs and the only ones, I don't know that I can. I mean, I can look that up and follow it at 28J if I can find that. It sounds like prong one is hanging by a thread here, right before our very eyes because you have no witness, you have no expert who said he's not intellectually disabled. You have no case with similar IQs where prong one is not met. And so is this case really all about adaptive functioning and prong three since we've moved past two? I actually think it's more about prong one. I mean, because... But how many cases really get into that extra language of prong one beyond the IQ? What I've read, prong one, I understand there's that extra language in Murphy and perhaps Atkins, but the cases that I see on prong one go straight to IQ. Correct. And then on the other stuff where you may say that they bleed into each other, prong one and prong three, those are evaluated under prong three. Well, and I don't just... I mean, I couldn't disagree with you on that, but I think one thing you could look at in this case is that the focus on the IQ and the reliance on the IQs in this case is so much less based on the evidence of how this man lived his life from the age of 18 and up. And so, I mean, I know that maybe it hasn't made its way into a lot of cases in the past, and I think this case is different, though. I mean, this case is... You did... This jury couldn't rely too much on IQ scores, really, at all. Why? That's part... That's central to the question that's before us. I just... Based on all the other evidence of how he functioned in life, the fact that he had a low IQ score... So much more than that. But yes, I mean, absolutely, that's what we're talking about. What else? I know he had an affair. I know there was an insurance agent who thought that he was capable when he met with the insurance agent, but... Thought he was capable. I actually offered him a job to work for selling insurance and other financial services. You have Emma Watts, who was his case manager for two years, that said he had no problem communicating with me. I didn't notice anything that was wrong with him. The only thing different from him and a lot of inmates is he's actually very manipulative about getting his cell changes. I will focus on his job for a moment because, yes, he was a janitor and, yes, he was promoted to head janitor. The jury heard all that. The jury heard they had his job description, what he was responsible for doing. You also have a little bit of conflicting testimony with regards to his job because you had certain family members for Petitioner Testify, you know, things he didn't do. And then you have Mark Woodward, you know, the time that he did manage him, there were absolutely no family members working with him. Counsel, could I just ask you... I'm back to the issue of whether there's any expert support for the way the jury came out. Trying to determine whether someone is intellectually disabled or not seems to require some help to the fact finder from someone with expertise. Correct. And if the things that you've just been talking about, the job and other matters, to the extent that that evidence is relevant, doesn't the jury need some assistance from an expert who can say, I know from my training, experience, testing and everything else, how to build that information into the analysis, and it's my expert opinion that. Nobody said that at this trial, did they? I definitely think they need that. Well, if they need that, they didn't get it, did they? They didn't get the kind of expertise to make a rational decision about whether Mr. Smith was intellectually disabled or not. You just don't have an expert who expresses an opinion, Mr. Smith is intellectually disabled. Nobody said that, or even said he is intellectually disabled because, and give an explanation, and yet we have the jury coming back the way it did. So how does a rational juror, if you put yourself in the position of a rational juror, how do you get to a conclusion that Mr. Smith was intellectually disabled? In this particular case, I mean, I don't think you can find he's intellectually disabled in this case, just based on the evidence presented at trial. They did have an expert. I mean, they had Dr. Hopewell come in and talk all about his limitations. He did give the Vineland, but an expert is only so good until they're, I mean, I don't want to say impeached, but there's evidence on the other side. There's competing evidence from another expert. So, I mean, they weren't given a definitive. Let me ask a question this way. If I took one of these students, any one of them, and had an IQ test administered, and the IQ test comes back 138, 145. These are bright kids. And a position is going to depend on that, or the determination of how smart they are depends on that. And somebody comes by and says, oh, he's lying about it. He's smarter than that. He's been lying. That's subjective, right? Yes. That is totally subjective. Yes. One, we have some objectivity to be able to prove it. The other one, we're just, we don't know. We don't know whether he is or he isn't malingering. He's likely to malinger down, I guess. Why he'd want to do that, or she would want to do that, I don't know. But they can't malinger in the other direction. Correct. Right? Correct. So the other direction here is, I think the highest, I think that any of these objective tests came in, was it somewhere in the range of 65, I think was one of them. Is that right? The highest is a 73. Well, there was an extrapolated score of 73, a range, but an actual test. I think Dr. Murphy actually administered the test, and it was a 73. Yes. All right. Now, how do we know whether there was malingering involved in that? There was no, we don't. There was no test given. There was no test for malingering given with Dr. Murphy. The only malingering was to push the scores. Down to 55. Yeah. No. The only claimed malingering was that 55 was rigged, that the actual IQ was higher. Right. And the experts testified that, you know, the difference between a 55 and a 73 is significant. Whatever his test was, if he had to, quote, vote, he'd say he's intellectually disabled. Yes. Yes. And he did not administer, although he did not administer, if we're talking about Dr. Fred Smith, he did not administer any malingering test. Because your time is running. Could you address problem three? Yes. And as you begin to do that, can I ask you to concede the academic functionality part? Obviously, he has to have two. And his academics were pretty woeful. Do you concede that point? I think I would have to concede that, just based on the prosecutor's arguments at the hearing. How about communication? Absolutely not. I would not concede that. OK. Proposition three. Oh, OK. The ineffective assistance of counsel claim, court of criminal appeals. No, I meant the third prong of the test. Oh, OK. Sorry. Yeah, sorry. It's on my part as well. Well, we have to look at what the jury had. And what the jury had was the testimony from Dr. Hopewell. And Dr. Hopewell just testified that pursuant to the Vineland, I think Hopewell's testimony was that he had limitations in all three or all five areas of the Vineland. And so that's what the jury had in that respect. And then Dr. Call's testimony was that the Vineland is not a proper measure for prong three of the Murphy, based upon the way it was given. And that is right out of the book. And counsel, I think, did expect that based on the report. And so Dr. Hopewell was, he articulated why he did give the Vine. But again, there was no medical literature or anything that would back or substantiate that that would be a proper test to be given while you're in prison. In fact, there's really both experts have testified. Call did not testify that you should give the ABAS. What Call testified is that there is another test to be given. But none of these are normed for a prison setting. So his testimony was there wasn't a deficit in prong three and adaptive functioning. And that was based upon what he did at prison. He spoke with the petitioner at length and had no problems communicating with him. I think he may have even addressed the way he dressed or that could have been Hopewell. But they also talked with the psychiatrist, I think, at DOC and another DOC employee that had contacts with the defendant. And so the testimony, opposing testimony to that was that there was no adaptive functioning deficits. Other than, of course, I don't even know that they really talked too much about the academics. It just seems to kind of fall in line with this case, considering his academic record. But yes, so the jury had both. I'm going to shift gears. We probably want to come back to what you're talking about. But I've had this question about just our analytical framework under AEDPA as applied to this context. So at the intellectual disability trial, Mr. Smith had the burden. Yes, sir. And the burden was by a preponderance of evidence. Yes. The jury decided that he hadn't met the burden. Correct. OK. And then we have our case called Hooks. Yes. Which tries to explain the way we navigate this situation under AEDPA. Yes. And the OCCA applied, as far as the sufficiency of the evidence is concerned, a standard that is the equivalent of the Jackson test, which asks whether any reasonable jury could come out the way this jury did. All right, so far, so good. Yes. In your brief, you talk about the fact that there's double deference involved here. And I'm having a hard time understanding how that's supposed to work. With the Jackson test, because if the test is whether any rational jury can come out the way this jury did, and given that nobody's contesting Murphy or anything, what does AEDPA even add to that as a practical matter? I think it's just this court's review of the Court of Criminal Appeals decision. No, I understand that. Right. The Jackson test goes to reviewing the jury, whether rational jury, based on the evidence. We're reviewing the OCCA. But at the end of the day, aren't we just applying the Jackson test? We are just applying the Jackson test. But I still, I mean, even according to Hooks, this court does apply double deference to these cases. Yeah, I know it says that. And I know we've said it recently. We said it as recently as Simpson. Right. I'm just not seeing the daylight or the added. Maybe that's not the right way to put it. The added layer of deference. What does AEDPA add to that? I mean, it's already a standard. Any rational jury. How can AEDPA add anything to that? Because AEDPA is a reasonableness standard too. Right. It is a fair-minded jurist disagreement type standard that we look at now in Richter. So I mean, I guess they're probably close to the same as a Jackson standard. But you're looking at the light. I guess what we're looking at under AEDPA. Well, I keep seeing this double deference, double deference as if it's sort of Kings Act's court. You can't. But I'm just, I don't want to belabor the point. It's just, I've been having a little trouble understanding that. OK. The only way that, for me, that I look at it, and I think we argue it, is kind of what we've already discussed was that there's a, we give, you know, when we're looking at a sufficiency claim, you look at the evidence in the light most favorable to the state, and whether that was found beyond, or whether it was possible that they could find, in this case, that he didn't prove he was minimally retarded by a preponderance of the evidence. And so I think the first level of deference is that that's the jury's determination. And then maybe the second level of deference is just what we've talked about. Our Court of Criminal Appeals found that decision reasonable. And so this court just has to look at the Court of Criminal Appeals decision, and is it contrary to or non-reasonable application of Jackson. So, I mean, the double deference, I think it is a little bit harder on this type of a claim than it would be in, like, say, a Strickland claim. And we're here, true confessions. I'm at the point of the proof of his knowing of the intellectual disability, as opposed to the disability manifesting itself. The jury here had to have found that he did not prove that he didn't know. So that's a double negative. So the jury had to find that he knew that he was not intellectually disabled, I guess, in order to rule against him. I don't think so. I think we don't get past the first prong. Well, the jury was instructed, because there was argument on it. There's a disagreement about whether they were properly instructed. Everybody acknowledged that Murphy's language, that it must manifest before the age of 18. And then the jury instructions that they've suggested they give, say, present and known. I mean, there was discussion on the record. We need to make a record. The Court of Criminal Appeals needs to know this language appears to be different. The Court of Criminal Appeals has addressed that over the years and said it's not a problem. And I know it's changed now. But what they did in this case, just to make sure there wasn't confusion, is then they instructed the jury. I have 11 seconds. Can I finish this? Yes. That to establish, it says whether mental retardation before the age of 18 was present and known is a question of fact to be cited by you. To establish the first signs of mental retardation appeared and were recognized before the defendant turned 18, lay opinion and poor school records may be considered. And the school records were all sponsored through their witnesses, the teachers. So I mean, I can't imagine that if the jury hadn't made it to the second prong, that that would have even, I would suggest they would have likely found it. I mean, I don't think that this instruction or the other instruction shows that they would show any. I mean, it's got to be known because there's got to be evidence of it. I mean, someone's got to know something to present evidence of it. So I'm going to stop. Thank you very much. You had some reserved time, but we had a little bit of free time zone there. With that, we'd ask for a quorum in the district court. I just had a few points in rebuttal, Your Honor. In response to Judge Phillips' question about whether there's been a case with a certain IQ score where they were found to be mentally retarded, I would point to the Supreme Court's opinion of Broomfield, which is a habeas case. And in that case, the state court denied the defendant an Atkins proceeding based on kind of a scatter of IQ scores in the 75 to 76 range. A federal evidentiary hearing was held on the matter, and he was nonetheless found to be intellectually disabled. So I would provide that case to the court's attention. Also, with respect to the 73 IQ score that respondent places great emphasis on, this was testified to by Dr. Call in the Atkins trial referring to a past test administered by Dr. Murphy. Nowhere in the testimony of Dr. Call or in the 1994 testimony of Dr. Murphy, and I went back and looked, does he ever identify what type of test did he administer? But one thing that the respondent conveniently omits is that Dr. Murphy testified that Roderick Smith is mentally retarded. And even if we take the 73 at face value, with the standard error measurement applied, it still places him squarely in that intellectually disabled range. Counsel, what's your understanding based on the experts in this case? Is there a tipping point? What's the number? Well, as the Supreme Court has said, intellectual disability is not a number. It's not a number. But typically in the 77 to 75 range is where we're looking at. And I think it's important to remember that these cases involve what was once termed the mildly mentally retarded that operate in this kind of 55 to 75 range. We're not going to see the defendants in the lower, what was once termed the profoundly mentally retarded range. Those people don't make it to the criminal justice system. Either they're institutionalized or found incompetent. So this 55 to 75 range is typically the type of cases we're seeing. I thought it was two standard deviations. In other words, 70. But obviously can't hold a 70 because IQ is a range. That's correct. But it's two standard. So it's not 70 to 75. Well, 70. But we have to consider things like the standard error of measurement, which was mandated by the Supreme Court as well. 70 with the degree of measure, with the range. That's correct, Your Honor. And I'd also like to address the allegation that there was no Blackwell memory test administered to Mr. Smith in this case. Well, there was no testimony about it. And this was an exhibit attached to the habeas petition. It's not within the actual appeal. Notes indicate that that test was indeed administered to Mr. Smith. And I believe it was either in correspondence between Ms. High and Dr. Call. But it was provided as an exhibit in the habeas petition. Since adaptive behavior has really come to the fore here today. And I'm looking at your brief, page 64, where you complain about ineffective assistance of counsel because Dr. Hall was available to testify about having administered the habeas too. Correct. And that testimony was never before the jury? That testimony was not before the jury. And respondent referenced Dr. Hall's testimony at the resentencing, where according to respondent, she said that Mr. Smith was malingering. I don't necessarily recall her testimony quite that way. She did say that there had been some variances. But she unequivocally testified he was mentally retarded, without a doubt. Dr. Hall's habeas too results mirrored the results of Dr. Hopewell's Vineland results with respect, with one exception. And there were some slight variance in the social domain. But she still found that he fell within the bottom 2%. And the jury never heard that? The jury did not hear her testimony about the habeas. They did hear basically the same results from the Vineland. Yeah. But that got attacked by Dr. Call. It certainly got attacked by Dr. Call. All right. So. Hmm. Your Honors, in 2004, this court, in an opinion where it granted sentencing relief to Mr. Smith for ineffective assistance of counsel, acknowledged that there was compelling evidence of his mental retardation for mitigation purposes. That has to mean something today. And I would ask this court to reverse and remand with instructions to- Are you making a law of the case argument now? Well, it was in a slightly different context. So frankly, I cannot make that argument. But I do think it has some significance here. Three times the court acknowledged that there was compelling evidence of his mental retardation for the purposes of mitigation. Just because the context and the posture is different here shouldn't negate the fact that this client has repeatedly, from every, almost every evaluator, has found him mentally retarded. And his school records, or excuse me, his placement in these classes, clearly support it. So thank you for the court's time. Thank you very much. The case is submitted and counsel are excused. I think the argument has been extremely well presented and very helpful to the court. Thank you. We'll take a brief recess and then take up the last two cases after that brief recess.